FILED
United States Court of Appeals
Tenth Circuit

January 8, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENH CIRCUIT

SOUTHERN UTAH WILDERNESS
ALLIANCE; NATURAL RESOURCES
DEFENSE COUNCIL; THE WILDERNESS
SOCIETY; NATIONAL PARKS
CONSERVATION ASSOCIATION;
GRAND CANYON TRUST,

     Plaintiffs-Appellants,

v.

JUAN PALMA, in his official capacity as
Director of the Bureau of Land Management
Utah Sate Office; BUREAU OF LAND
MANAGEMENT; UNITED STATES
DEPARTMENT OF THE INTERIOR,

     Defendants-Appellees,

and

KIRKWOOD OIL AND GAS, LLC;
WILLIAM C. KIRKWOOD,

     Intervenor-Defendants-Appellees.

No. 11-4094

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:07-CV-00199-CW)**

Stephen H.M. Bloch of Southern Utah Wilderness Alliance, Salt Lake City, Utah
(David Garbett of Southern Utah Wilderness Alliance, Salt Lake City, Utah; and

Sharon Buccino of Natural Resources Defense Council, Washington, D.C., with him on the briefs), for Plaintiffs-Appellants.

Jeffrey E. Nelson, Assistant United States Attorney (Carlie Christensen, United States Attorney, with him on the brief), Salt Lake City, Utah, for Defendants-Appellees.

William E. Sparks (Bret A. Sumner with him on the brief) of Beatty & Wozniak, P.C., Denver, Colorado, for Intervenor-Defendants-Appellees.

Before **LUCERO**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Several environmental groups[1] (collectively referred to as "SUWA") challenge decisions made by the Bureau of Land Management ("BLM") and the Interior Board of Land Appeals ("IBLA"). At issue is the legality of thirty-nine oil and gas leases in Southern Utah, owned by Kirkwood Oil and Gas, LLC and William C. Kirkwood (collectively "Kirkwood"). In the 1980s, Kirkwood applied to have its oil and gas leases converted to combined hydrocarbon leases, which would allow Kirkwood to extract oil from tar sands. To date, BLM has never accepted or rejected Kirkwood's applications. Between 2006 and 2008, BLM and IBLA issued several decisions declaring that the underlying oil and gas leases

---

[1] Southern Utah Wilderness Alliance, Natural Resources Defense Council, The Wilderness Society, National Parks Conservation Association, and Grand Canyon Trust.

were "suspended" pending review of the conversion applications. SUWA alleges BLM and IBLA violated the Mineral Leasing Act and other federal laws by retroactively deeming these thirty-nine leases to be suspended, thereby avoiding expiration of the leases according to their terms. The district court held SUWA did not have standing to bring its claims and dismissed the suit for lack of subject matter jurisdiction.

We have jurisdiction under 28 U.S.C. § 1291. Although the district court misapplied the law in important respects with regard to standing, as we explain below, we ultimately hold that this action is not ripe for review. Accordingly, we affirm the district court's dismissal of the action for lack of subject matter jurisdiction.

## I.

### A. Statutory And Regulatory Background

"Tar sands are loosely defined as any sedimentary rock impregnated with heavy, viscous crude oil that cannot be recovered by conventional techniques but rather requires an external energy source (e.g., heat) to mobilize the oil." Supp. App. at 33. Areas with substantial tar sands are also likely to have oil and gas.

The Combined Hydrocarbon Leasing Act of 1981, Pub. L. No. 97-78, 95 Stat. 1070, was enacted to encourage the production of oil from tar sand deposits in the United States. The Act amended the Mineral Leasing Act and authorized

the Secretary of the Interior to issue combined hydrocarbon leases ("CHLs") in areas that contain substantial deposits of tar sands and have been designated as "Special Tar Sand Areas" ("STSAs"). *See* 30 U.S.C. §§ 181, 226; 43 C.F.R. § 3140.0-5(c).[2] A CHL allows the lease owner to extract oil from tar sands, as well as oil and gas from traditional deposits. *See* 43 C.F.R. § 3140.0-5(a).

Under the Combined Hydrocarbon Leasing Act, owners of traditional oil and gas leases in STSAs could convert their leases into CHLs. 30 U.S.C. § 226(n). An oil and gas lease was eligible for conversion into a CHL if it was issued prior to November 16, 1981 and was located in an STSA. *Id.* § 226(n)(1)(A). Only the owner of the lease could submit the application for conversion. 43 C.F.R. § 3140.2-2. The owner of an eligible lease had a two year window – until November 15, 1983 – to submit an application to the Utah State Office of BLM. 30 U.S.C. § 226(n)(1)(A); 43 C.F.R. § 3140.3-1. The application required, *inter alia*, a "plan of operations" for development. 30 U.S.C. § 226(n)(1)(A); 43 C.F.R. § 3140.2-3(a).

As provided by BLM regulations in effect at the time:

> Upon determination that the plan of operations is complete, the supervisor shall notify the authorized officer who shall then suspend the term of the Federal oil and gas lease(s) as of the date that the complete plan was filed until the plan is finally approved or rejected. Only the term of the oil and gas lease shall be suspended, not any operation and production requirements thereunder.

---

[2] In this opinion, unless otherwise indicated, we cite to the 2012 version of the Code of Federal Regulations.

43 C.F.R. § 3140.2-3(g)(1) (1982), 47 Fed. Reg. 22,474, 22,480 (May 24, 1982).[3]

Federal oil and gas leases are generally issued for a primary term of ten years, 30

U.S.C. § 226(e), and the suspension prevents the lease term from expiring while

the conversion application is pending. *See* 43 C.F.R. § 3103.4-4(b) ("[N]o lease

shall be deemed to expire during any suspension.").[4] The Combined Hydrocarbon

Leasing Act mandates that "The Secretary shall act upon a proposed plan of

operations within fifteen months of its submittal." 30 U.S.C. § 226(n)(1)(B).

If the plan of operations is found acceptable and is approved, the oil and

gas lease is converted into a CHL with a new effective start date and a new ten-

year term. 43 C.F.R. §§ 3140.4-1, 3140.4-2, 3140.5. If the application is

rejected, then the lease suspension is lifted. *Id.* § 3140.2-3(g)(1) (the lease term

shall be suspended "until the plan is finally approved or rejected"). Thereafter,

the original oil and gas lease remains valid until the expiration of its term, which

is extended by the duration of the suspension. *See id.* § 3103.4-4(b) ("The term

---

[3] The language of this regulation changed in 1990. The current version of 43 C.F.R. § 3140.2-3(g)(1) states:

> Upon determination that the plan of operations is complete, the authorized officer shall suspend the term of the Federal oil and gas lease(s) as of the date that the complete plan was filed until the plan is finally approved or rejected. Only the term of the oil and gas lease shall be suspended, not any operation and production requirements thereunder.

[4] The oil and gas leasing regulations found in 43 C.F.R. part 3100 are "applicable, as appropriate" to CHLs as well. 43 C.F.R. § 3140.1-4(e).

of any lease shall be extended by adding thereto the period of the suspension

. . . ."); *cf.* 30 U.S.C. § 226(n)(2) ("Except as provided in this section, nothing in

the Combined Hydrocarbon Leasing Act of 1981 shall be construed to diminish or

increase the rights of any lessee under any oil and gas lease issued prior to

November 16, 1981.").[5]

The STSAs at issue here are the Circle Cliffs STSA and the Tar Sand

Triangle STSA. *See* 45 Fed. Reg. 76,801 (Nov. 20, 1980). Both of these STSAs

are located in Southern Utah. The Tar Sand Triangle STSA is an area comprising

approximately 230 square miles. The Circle Cliffs STSA covers approximately

215 square miles.

Some of the leases at issue in this case are located on lands that are now

subject to certain restrictions on mineral leasing. As an illustrative example,

Kirkwood's Circle Cliffs STSA leases are within the Grand Staircase-Escalante

National Monument. This monument was established in 1996 by Presidential

Proclamation. 61 Fed. Reg. 50,223 (Sept. 18, 1996). The proclamation withdrew

---

[5] This interpretation of the Combined Hydrocarbon Leasing Act and its implementing regulations is consistent with BLM's interpretation. *See, e.g.*, Aplt. Supp. Authority (Jan. 25, 2012), *1984 Tar Sand Triangle Draft Environmental Impact Statement* at 4-117 ("Any existing federal oil and gas leases not converted to combined hydrocarbon leases would remain valid oil and gas leases until the expiration of their original term and could still be developed for oil and gas."); Letter from BLM to Altex Oil Corp. and Devon SFS Operating, Inc., Re: UTU-72405 (Jan. 10, 2002), Supp. App. at 90 ("If you no longer wish to convert the oil and gas leases into a CHL, . . . the suspensions will be lifted on the oil and gas leases, and they will revert to their individual lease terms.").

all federal lands and interests within the monument from new leasing, but specified that "[t]he establishment of this monument is subject to valid existing rights." *Id.* at 50,225; *see also* 30 U.S.C. § 181 (excluding lands containing deposits of oil and gas in national parks and monuments from disposition). As a result, *new* mineral leasing within the monument is prohibited, although mineral development is permitted under *existing* leases.

## B. Factual Background

In 1982 and 1983, Kirkwood or its predecessors applied to convert oil and gas leases in the Circle Cliffs and Tar Sand Triangle STSAs into CHLs. These leases, including the thirty-nine leases at issue in this case, were grouped into three applications: UTU-72405, UTU-73098, and UTU-72120.[6] The parties agree that between 1983 and 1984, BLM determined that all three applications contained complete plans of operations.

The parties also agree that once BLM determined Kirkwood had submitted complete plans of operations for these three applications, the leases included in the applications should have been suspended. *See* 30 U.S.C. § 226(n)(1)(B); 43

---

[6] A single application for CHL conversion could include multiple leases. Two of the applications, UTU-72405 and UTU-73098, include leases within the Tar Sand Triangle STSA. UTU-72405 includes six of the challenged leases. UTU-73098 includes eight of the challenged leases. The third application, UTU-72120, includes leases within the Circle Cliffs STSA, twenty-five of which are being challenged by SUWA. Although each of the applications also includes some leases that have not been challenged by SUWA, we only discuss the thirty-nine leases at issue in this case.

C.F.R. § 3140.2-3(g)(1) (1982). They disagree, however, about whether the leases actually were suspended at that time. According to Kirkwood and the government, the leases were automatically suspended as of the dates of the filings of complete plans of operations, and they have continued to be suspended since then. According to SUWA, however, the suspension of the leases was not automatic and BLM failed to suspend them in the 1980s. *See* 43 C.F.R. § 3140.2-3(g)(1) (1982) ("Upon determination that the plan of operations is complete, the supervisor shall notify the authorized officer who shall then suspend the term of the Federal oil and gas lease(s) as of the date that the complete plan was filed until the plan is finally approved or rejected."). SUWA notes that the administrative record for these applications does not contain any notices suspending the terms of the leases. *See, e.g.*, *William C. Kirkwood*, 175 IBLA 292, 297 (2008) ("[T]he record [regarding UTU-72120] does not contain a notice suspending the terms of the leases subject to the application . . . ."). In its view, because the lease terms were not suspended, the oil and gas leases expired sometime between 1984 and 1992.

The parties also disagree about the effect of the suspension, if the leases were suspended. Kirkwood contends that its leases are subject to a suspension of operations, not only a suspension of term, and this suspension prevents it from engaging in operations on the leasehold. According to Kirkwood, "[B]ecause the [Combined Hydrocarbon Leasing Act] mandates that BLM suspend the 39 oil and

-8-

gas leases which are the foundation of Kirkwood's CHL Applications, Kirkwood presently has no right to enter upon, explore or otherwise impact the subject lands while the oil and gas leases are suspended and the CHL Applications are pending." Aplt. App. at 110. Several documents in the administrative record corroborate its position. At certain points in the CHL application process, including in the BLM decisions challenged by SUWA in this case, BLM has characterized the leases as being under a "suspension of operations." *See* Supp. App. at 112, 117, 123.

In contrast, SUWA and the government both maintain that any suspension was only of the term of the lease. Thus, according to the government, "The suspension affects only the terms of the leases, not the lessees' right to conduct operations and production on the leases." Aplt. App. at 119; *see also id.* at 118 & n.2. SUWA agrees. *See* Aplt. Br. at 11 n.2 ("Suspensions granted under the CHL regulations only suspend the term of a lease . . . ."). The Combined Hydrocarbon Leasing Act and its implementing regulations lend support for SUWA and the government's interpretation. Notably, the regulations dictate that "only the term" of a lease is to be suspended while a CHL application is pending, "not any operation and production requirements thereunder." 43 C.F.R. § 3140.2-3(g)(1); *see also* 30 U.S.C. § 226(n)(1)(B) ("[T]he Secretary shall suspend the running of the term of any oil and gas lease proposed for conversion until the plan is finally approved or disapproved."). If SUWA and the government are correct, a lessee

would not necessarily be prevented from operating or producing on the lease by virtue of a pending CHL application.

Despite the Combined Hydrocarbon Leasing Act's requirement that the Secretary act within fifteen months, 30 U.S.C. § 226(n)(1)(B), BLM has never approved or rejected Kirkwood's three CHL conversion applications. In 2006 and 2007, after the passage of twenty-five years, BLM issued a series of interim decisions (the "BLM Decisions") relating to Kirkwood's applications. In October 2006, BLM stated the eight leases in application UTU-73098 "were entitled to a suspension of operations as of the date a complete [plan of operations] was filed, November 29, 1983." Supp. App. at 122 (citing 43 C.F.R. § 3140.2-3(g)(1)). BLM explained that rentals are required during a suspension, stated that Kirkwood had not made the necessary payments, and requested payment for the previous seven years. Kirkwood was also informed that if its CHL application was denied for failing to make the payments, "The leases will continue through their term as long as rentals or royalties are timely paid." *Id.* at 124.

In January 2007, BLM issued decisions on UTU-72120 and UTU-72405. As to application UTU-72405, one of the six challenged leases was "excluded" from the application and rejected because the application was not filed by the record title holder of the lease. *Id.* at 116-17. The five remaining leases in this application were "deemed to have been suspended as of the date of filing the complete plan, July 19, 1983." *Id.* at 117 (citing 43 C.F.R. § 3140.2-3(g)(1)).

BLM again required Kirkwood to submit payment of seven years' rentals for these "suspended" leases. Kirkwood was notified that if "the CHL is denied, we will lift the suspension on leases. The leases will continue through their term as long as rentals or royalties are timely paid." *Id.* at 118.

As to UTU-72120, BLM determined the terms of five of the challenged leases had expired before a complete plan of operations for the conversion application was filed. As a result, those leases had "terminated by operation of law." *Id.* at 111. Twelve other leases were excluded from the application because BLM determined the application was not submitted by the record title holder of the leases. The remaining eight leases were "deemed to have been suspended as of the date of filing the complete plan, August 8, 1983." *Id.* at 112 (citing 43 C.F.R. § 3140.2-3(g)(1)). BLM requested seven years of back payment of rent for these leases. Kirkwood was notified that if "the CHL application is denied, we will lift the suspension on these leases and readjust the term of the lease [sic]." *Id.* at 112-13.

Kirkwood appealed parts of the BLM Decisions to IBLA.[7] In particular, Kirkwood disagreed with BLM's findings that certain oil and gas leases had terminated prior to its submission of a complete plan of operations, that other

_____

[7] SUWA moved to intervene in the appeal, but IBLA denied the motion. Instead, SUWA submitted an amicus brief for each appeal. In its amicus brief, SUWA raised the same arguments that it raises in this litigation. *See Kirkwood*, 175 IBLA at 301, 303.

leases were excluded for not having been filed by the record title holders, and that it owed back rent to BLM on the suspended leases. IBLA agreed with Kirkwood, and on August 15, 2008 it reversed the BLM Decisions on these issues. *Kirkwood*, 175 IBLA at 319-20. IBLA reinstated the leases excluded by BLM, decided that BLM was equitably estopped from claiming Kirkwood owed back payments for the leases it had deemed suspended, and allowed Kirkwood to submit letters from the record title holders to cure the deficient applications. *Id.*

**C. SUWA's Challenge to the Leasing Decisions**

In April 2007, SUWA filed its original complaint in the present matter, challenging the BLM Decisions that deemed the various oil and gas leases to be suspended as of the dates of the filings of complete plans of operation. On August 20, 2008, the district court dismissed SUWA's suit without prejudice. It held that SUWA's claims were not ripe for review because IBLA was in the process of considering Kirkwood's appeals of the BLM decisions on UTU-72120 and UTU-72405. Unbeknownst to the district court, IBLA had already issued its decision. SUWA notified the district court of the decision and was given leave to file an amended complaint.

SUWA filed its Amended Complaint on September 23, 2008. That complaint again challenges the BLM Decisions, as well as the 2008 IBLA decision (collectively the "Challenged Decisions"). SUWA contends the thirty-nine leases at issue in this case terminated years ago when BLM failed to take

action to suspend their termination once complete plans of operations were submitted for the CHL applications. In the alternative, SUWA contends that even if the leases were automatically suspended in 1983 and 1984 when the plans of operation were filed, as defendants contend, the leases terminated when Kirkwood failed to make required rental payments during the suspension period.

SUWA argues that the Challenged Decisions illegally suspended the leases retroactively in violation of the Mineral Leasing Act and other federal laws. In particular, it maintains the Challenged Decisions violated the Combined Hydrocarbon Leasing Act and its implementing regulations by deeming the leases to be suspended after they had terminated. It contends these "retroactive suspensions" of the leases subsequent to their termination effectively resulted in what it characterizes as the "issuance" of thirty-nine new oil and gas leases. SUWA also claims BLM and IBLA issued some of these "new" leases unlawfully, because they are in areas now barred from new mineral leasing. *See* 30 U.S.C. § 181; 43 C.F.R. § 3100.0-3(a)(2)(viii). Even in areas where new leasing may be permissible, SUWA contends BLM failed to comply with the applicable regulations under the Mineral Leasing Act. For example, SUWA alleges BLM violated mandatory procedures under the Mineral Leasing Act and its implementing regulations by issuing new leases in the Glen Canyon National Recreation Area without seeking the requisite consent of the Regional Director of the National Park Service. *See* Amended Complaint, App. at 61 (citing 43 C.F.R.

-13-

§§ 3100.0-3(g)(4), 3109.2).

According to the Amended Complaint, "SUWA members frequently visit and recreate (e.g., hunt, camp, bird, sightsee, and enjoy solitude) throughout the lands that are the subject of this complaint . . . ." *Id.* at 47.  SUWA alleges the inevitable drilling that will occur under these leases – regardless of whether they are ultimately converted to CHLs or remain traditional oil and gas leases – "will have dramatic, lasting negative impacts including destruction of pre-historic and historic cultural resources, degradation of air quality and pristine night skies, loss of wildlife habitat, and loss of wilderness values and characteristics." *Id.* at 46. "This inevitable surface disturbance harms the interest of SUWA and its members in the leased lands." *Id.* at 47.

The district court dismissed SUWA's Amended Complaint for lack of standing.  It determined SUWA failed to establish an injury in fact.  In part because the district court had not considered relevant affidavits from the administrative record, SUWA filed a motion to alter or amend the judgment.  The court permitted SUWA to supplement the record with further information to establish standing, and SUWA submitted additional affidavits.  The court concluded the supplemental materials failed to cure the standing deficiency and dismissed the action.  SUWA appeals.

## II.

Kirkwood and BLM argue that this action is not justiciable because SUWA lacks standing to bring the case. Kirkwood contends in addition that the action is not ripe for review. Both standing and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute. *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004) ("justiciability focus[es] on the twin questions of whether Plaintiff has standing to maintain this action and whether the case is ripe for judicial review."). We address each issue in turn.

### A. Standing

We review de novo the question of whether SUWA has standing. *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). When evaluating a plaintiff's standing at the stage of a motion to dismiss on the pleadings, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Selden*, 422 U.S. 490, 501 (1975). "We also must construe the statements made in the affidavits in the light most favorable to the petitioner." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc) (internal quotation marks omitted).[8] At the pleading stage, "general factual allegations of

---

[8] Because the district court permitted SUWA to submit supplemental affidavits to demonstrate standing, we consider those affidavits as well. *See Warth*, 422 U.S. at 502 (examining "all materials of record" when evaluating standing).

injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)) (alteration in original); *see also Bennett v. Spear*, 520 U.S. 154, 168 (1997) (same).

Where, as here, the original complaint has been superceded by an amended complaint, we examine "the amended complaint in assessing a plaintiff's claims, including the allegations in support of standing." *Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007). Nevertheless, "standing is determined at the time the action is brought . . . and we generally look to when the complaint was first filed, not to subsequent events" to determine if a plaintiff has standing. *Id.* at 1253-54 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)); *see also Davis v. FEC*, 554 U.S. 724, 735 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005) ("Standing is determined as of the time the action is brought."). Accordingly, "[t]he initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended." *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005); *see also Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (similar). Thus, although we examine the allegations in SUWA's Amended

Complaint, our inquiry focuses on whether SUWA had standing when the original complaint was filed in April 2007.

The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Absent a plaintiff with constitutional standing, federal courts lack jurisdiction. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009). To satisfy Article III's standing requirements, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth*, 528 U.S. at 180-81 (citing *Defenders of Wildlife*, 504 U.S. at 560-61). "The element of traceability requires the plaintiff to show that the defendant is responsible for the injury, rather than some other party not before the court. Finally, the requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision." *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010).

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted

-17-

nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth*, 528 U.S. at 181. Here, because the plaintiff groups' claims and requested relief are germane to their purposes and do not require the participation of any individual member, these organizations have standing if any one member would have standing to sue in his or her own right.

SUWA's alleged injury results from Kirkwood's right to engage in mineral development on the lands at issue in the thirty-nine leases. The Amended Complaint states that SUWA's members frequently visit and use the lands affected by the leasing decisions for various purposes, including hunting, camping, bird watching, sightseeing, and enjoying solitude. SUWA asserts that the retroactive suspension of the thirty-nine leases, and the inevitable "surface disturbance on the leasehold" that will result, harms the interests of SUWA and its members. App. at 47.

SUWA relies on the declarations of one of its members who is also an employee, Ray Bloxham, to show that it has standing to sue.[9] In the six declarations ultimately submitted to the district court, Mr. Bloxham detailed his

_____

[9] We are unpersuaded by Kirkwood's claim that Mr. Bloxham's employment at SUWA disqualifies him from declaring his personal interests, as a member of SUWA, in the environment of Southern Utah and in this controversy in particular. Mr. Bloxham's declarations demonstrate a longstanding interest in the environment and in the natural beauty of Utah. His personal interests align, rather than conflict, with those of his employer. Because Mr. Bloxham is also a member of the other plaintiff organizations, our analysis is the same for all of these organizations.

interest in the public lands at issue in this case. He explained he has "visited both the Tar Sand Triangle STSA and the Circle Cliffs STSA and the public lands where these leases are located numerous times beginning in 1995." *Id.* at 277. He described the areas he visited during specific times. For example, he stated that during a September 2006 trip to the Tar Sand Triangle STSA,

> I drove down the Flint Trail and I passed by Bagpipe Butte, Sewing Machine Pass, Elaterite Butte, Gunsight Butte, and the Block. I enjoyed the solitude, scenery, and opportunities for primitive recreation of the area. I did not see any other parties during my entire visit. On previous visits, I have camped on The Big Ridge, I have driven the Poison Spring Canyon road to the North Hatch Canyon Road, I have hiked around The Block, and I have driven the Doll House road. This area is utterly remote. It contains remarkably deep and stunning canyons, expansive vistas, huge cliffs, and awe-inducing silence.

*Id.* at 264. Similarly, Mr. Bloxham described trips in June 2004 and February 2007 through the Circle Cliffs STSA:

> I hiked in Little Death Hollow Canyon, drove the Wolverine Loop road, camped under the Circle Cliffs, and explored Moody and Middle Moody Canyons and Colt Mesa. In that area I have also explored the Pioneer Mesa and Studhorse Peaks proposed wilderness units and have taken scenic tours of the area. I have enjoyed the solitude, scenery, and opportunities for primitive recreation in the area. Like much of the Grand Staircase-Escalante National Monument, the Circle Cliffs STSA is remote and quiet. It is etched with canyons, complimented by expansive views, and beautifully still.

*Id.* at 256. He clarified that these "lengthy descriptions of travel . . . highlighted the areas that I have visited, all of which either enter leases at issue here or afford views of those locations." *Id.* at 277.

-19-

He further explained, "Tar sands development, or conventional oil and gas development, in [the Tar Sand Triangle STSA] would result in a tragic loss of remoteness, wildness, and pristinity," and development within the Circle Cliffs STSA "would destroy the incredible character of this unique and picturesque area." *Id.* at 264-65. "My health, recreational, spiritual, educational, aesthetic, and other interests are directly affected and irreparably harmed by the BLM and IBLA's decisions to retroactively suspend the thirty-nine leases at issue in this litigation and the associated development, either conventional or unconventional, that could result in these areas . . . ." *Id.* at 274. He stated that he intends to return to these areas "as often as possible, but certainly within the next year." *Id.* at 264.

The district court determined these affidavits and the Amended Complaint failed to demonstrate an injury in fact because they did not identify specific visits to each of the thirty-nine leases at issue. The court also concluded the affidavits were insufficient because SUWA's members only occasionally visited the relevant areas and failed to provide sufficiently imminent plans to return. *See* App. at 229 ("Because Members' past visitations do nothing more than create isolated visits to the areas in question, more specificity is required in their future planning to remove the injury from the 'speculative' and place it within the realm of 'concrete' and 'imminent.' Under these facts, simply declaring their intent to return within the course of the year does not suffice."). In its view, any

-20-

imminence of injury was further undermined by the duration of litigation. The court explained that even though members had averred plans to return certainly within the year, more than a year had passed since the affidavits were signed and "the stated timetable for Members to make their return trips has lapsed. . . . [T]here is now no evidence that they ever intend to return." *Id.* at 230.

In urging us to affirm the district court, Kirkwood and the government first contend SUWA's injuries are insufficiently concrete and particularized, asserting that "Mr. Bloxham's multiple declarations do not provide the requisite demonstration of use of the land's [sic] covered by Kirkwood's CHL Applications to establish an injury-in-fact." Kirkwood Br. at 38. Relying primarily on *Defenders of Wildlife*, 504 U.S. at 565-66, they argue Mr. Bloxham's declarations lack the specificity necessary to show a particularized interest in the land.

### 1. *Concrete and Particularized Injury*

"The purpose of the injury-in-fact requirement of Article III is to ensure only those having a 'direct stake in the outcome,' and not those having abstract concerns, may have access to the courts." *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451 (10th Cir. 1996) (quoting *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)). Where, as here, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Defenders of Wildlife*, 504 U.S. at 562

-21-

(internal quotation marks omitted).  As a general rule, however, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  "While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."  *Summers*, 555 U.S. at 494.

The district court misapplied the law when it rejected SUWA's standing on the basis that the affidavits failed to show its members have visited each of the leases at issue.  Neither our court nor the Supreme Court has ever required an environmental plaintiff to show it has traversed each bit of land that will be affected by a challenged agency action.  Although the Supreme Court has stated that "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it," *Defenders of Wildlife*, 504 U.S. at 565-66 (citing *Nat'l Wildlife Fed'n*, 497 U.S. at 887-889), that statement must be read in context.  In *National Wildlife Federation*, the Court explained in the summary judgment context that the heftier requirements of Rule 56 were "assuredly not satisfied by averments which state only that one of respondent's members uses *unspecified portions* of an immense tract of territory, on some portions of which mining activity has occurred or

-22-

probably will occur by virtue of the governmental action." 497 U.S. at 889 (emphasis added). Similarly, in *Defenders of Wildlife*, 504 U.S. at 566, the Court rejected the notion that plaintiffs could demonstrate an injury while only "us[ing] portions of an ecosystem not perceptibly affected by the unlawful action in question." Neither of these cases is remotely similar to the case at bar.

Indeed, Mr. Bloxham's declarations go beyond the general factual allegations needed at the pleading stage. As his affidavits described in detail, he has traveled extensively through these STSAs, has traversed through or within view of the parcels of land where oil and gas development will occur, and plans to return as often as possible, but certainly within a year. He specified areas which he has visited, averred that these specific areas will be affected by oil and gas drilling, and stated his interests will be harmed by such activity. This is sufficient. A plaintiff who has repeatedly visited a particular site, has imminent plans to do so again, and whose interests are harmed by a defendant's conduct has suffered injury in fact that is concrete and particularized. *See Summers*, 555 U.S. at 494; *see also S. Utah Wilderness Alliance*, 620 F.3d at 1234 ("'In an environmental case . . . a plaintiff need only show that he used the affected area, and that he is an individual for whom the aesthetic and recreational values of the area are lessened by the defendant's activity.'" (quoting *Piney Run Preservation Ass'n v. Cnty. Comm'rs*, 268 F.3d 255, 263 (4th Cir. 2001) (alteration in original)).

Recent precedent from our court demonstrates that Mr. Bloxham's declarations are more than sufficient to establish SUWA's injury at the pleading stage. In *Southern Utah Wilderness Alliance*, 620 F.3d at 1234, for example, the "amended complaint state[d] that its members use the lands affected by these [mining] permits for various purposes – scientific study, hunting, aesthetic appreciation, sightseeing, and solitude. They claim that the proposed mining operations would impair many, if not all, of these uses." We held there was an injury in fact and noted this type of injury "has often been used to demonstrate standing . . . ." *Id.* Here, SUWA has made similar claims and has adequately alleged a concrete, particularized injury.

The reality that this litigation has taken several years does not render Mr. Bloxham's intentions to return "certainly within the next year," App. at 264, inadequate for standing. As we explained *supra*, "standing is determined at the time the action is brought." *Mink*, 482 F.3d at 1253. Any concern that SUWA subsequently lost its interest in this litigation is relevant to mootness, not standing. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (internal quotation marks omitted)). Accordingly, the district court erred when it held SUWA had failed to show a concrete injury sufficient to support standing.

-24-

## 2. *Imminence of Injury*

Kirkwood and the government also argue that SUWA's injuries are not actual or imminent because Kirkwood's leases are considered by the BLM to be suspended and Kirkwood currently does not hold drilling permits to conduct oil and gas development on its leaseholds. Kirkwood contends in addition that SUWA cannot show imminent injury because "BLM's 2006 and 2007 Decisions did not approve any of Kirkwood's CHL applications, or issue any oil and gas leases or suspend any existing oil and gas leases. There has been no 'irretrievable commitment of resources' because BLM has not issued the combined hydrocarbon leases to Kirkwood." Kirkwood Br. at 31 (citing *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009)).

"Although 'imminence' is concededly a somewhat elastic concept," its purpose in the standing formulation "is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is 'certainly impending.'" *Defenders of Wildlife*, 504 U.S. at 564 n.2. The doctrines of standing and ripeness substantially overlap in many cases, *Morgan v. McCotter*, 365 F.3d at 887. Such is the case here, where the question of whether SUWA faces an imminent injury involves similar concerns as whether SUWA's suit is ripe for adjudication. "The standing question thus bears close affinity to questions of ripeness – whether the harm asserted had matured sufficiently to warrant judicial intervention." *Warth v. Selden*, 422 U.S. at 499 n.10.

But there are also important differences between the two doctrines, as our sister circuit has explained,

> When determining standing, a court asks whether these persons are the proper *parties* to bring the suit, thus focusing on the qualitative sufficiency of the injury and whether the complainant has personally suffered the harm. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1 (1989). When determining ripeness, a court asks whether this is the correct *time* for the complainant to bring the action. *See id.*

*Wilderness Soc. v. Alcock*, 83 F.3d 386, 390 (11th Cir. 1996); *see also* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3532.1 (3d ed. 2008) ("As compared to standing, ripeness assumes that an asserted injury is sufficient to support standing, but asks whether the injury is too contingent or remote to support present adjudication.").

The question here is not *whether* SUWA is a proper party to challenge BLM's decision, but *when* it can do so. Given the overlap between the doctrines of standing and ripeness, and given that SUWA is a proper party to bring this action if this is the correct time to do so, we think this case is more appropriately decided under the ripeness doctrine, which has been "characterized as standing on a timeline." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc); *see also Wright & Miller*, *supra*, § 3532.1 ("Both ripeness and mootness, moreover, could be addressed as nothing but the time dimensions of standing."). Accordingly, rather than further analyzing the standing issue, we turn to the question of ripeness.

## III.

The district court did not address ripeness, although the issue was raised and briefed below. The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 58 n.18 (1993). Accordingly, we may decide the issue even when it was not reached by the district court. *See Utah v. U.S. Dep't of the Interior*, 210 F.3d 1193, 1196 n.1 (10th Cir. 2000).

The doctrine of ripeness prevents courts "from entangling themselves in abstract disagreements over administrative policies," while also "protect[ing] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803, 807-08 (2003). "In evaluating ripeness the central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Initiative & Referendum Inst.*, 450 F.3d at 1097 (internal quotation marks omitted).

In deciding whether an agency's decision is ripe for judicial review, we

examine "both the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (quoting *Abbott Labs.*, 387 U.S. at 149); *see also Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1249 (10th Cir. 2011). In doing so, we may consider:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

*Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 (10th Cir. 2001) (citation omitted); *see also Mobil Exploration & Producing U.S., Inc.*, 180 F.3d 1192, 1197 (10th Cir. 1999).[10]

The parties focus on whether the Challenged Decisions constitute final agency action because if they do not, they are clearly not fit for judicial review. Section 704 of the APA provides that an agency action is "subject to judicial review" when it is either: (1) "made reviewable by statute," or (2) a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Agency action is final if it marks "the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been

---

[10] We sometimes articulate our ripeness review as proceeding under a three-factor test, *see, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1262-63 (10th Cir. 2002). These two tests are essentially the same. *Id.* at 1263 n.3; *Coal. for Sustainable Res., Inc.*, 259 F.3d at 1250 n.11.

determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).

Here, the Challenged Decisions did conclusively determine that Kirkwood continues to own unexpired leases that will ultimately give it some right to oil and gas production on the land, whether under Combined Hydrocarbon Leases if the applications are granted, or during the remaining terms of the underlying oil and gas leases if the combined leases are denied and the lease terms now deemed suspended are thereby revived. Whether Kirkwood retains *any* right in the underlying leases is the very issue SUWA has raised on appeal. On the other hand, the Challenged Decisions were merely part of a larger process for determining whether to accept Kirkwood's CHL conversion applications, a process that has not been completed. IBLA remanded the cases to BLM, *see Kirkwood*, 175 IBLA at 319, and Kirkwood's CHL applications remain pending.

It is true that in a typical mineral leasing case, environmental plaintiffs do not have to wait until drilling permits have been issued before they may bring suit. Federal courts have repeatedly considered the act of issuing a lease to be final agency action which may be challenged in court.[11] *See, e.g.*, *New Mexico*,

---

[11] The Department of the Interior manages the federal oil and gas resources through a three-stage decisionmaking process. *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004). First, BLM "develops land use plans – often referred to as resource management plans (RMPs)." *Id.*; *New Mexico*, 565 F.3d at 716 (same). "Next, BLM issues a lease for the use of particular land." *New Mexico*, 565 F.3d at 716. Third, "[t]he lessee may then apply for a permit to drill, and BLM will decide whether to grant it." *Id.*

565 F.3d 683; *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983). In part this is so because the issuance of the lease represents the irreversible and irretrievable commitment of public resources for private use. *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999). Once the lease is issued, the lessee "cannot be prohibited from surface use of the leased parcel." *New Mexico*, 565 F.3d at 718 (citing 43 C.F.R. § 3101.1-2). Indeed, the terms of oil and gas leases issued on public lands give a lessee legal incentives to begin development with haste because generally a lessee must diligently develop the leasehold or else the lease will expire at the end of its primary term. *See* 30 U.S.C. § 226(e) ("Each such lease shall continue so long after its primary term as oil or gas is produced in paying quantities.").

Moreover, where a lessee has purchased a lease, it has usually taken some concrete step toward disturbing the ground of the leasehold. *See New Mexico*, 565 F.3d at 718 (noting the record reveals the lessee's "concrete plans" to build wells); *cf. Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1198 (10th Cir. 2008) (observing we have found hardship where "the defendant had taken some *concrete action* that threatened to impair – or had already impaired – the plaintiffs' interests" (citing *Sierra Club*, 287 F.3d at 1264-65)).

But these cases are distinguishable from the circumstances here, which are far from the usual case involving issuance of a lease. What SUWA characterizes as the "reissuance" of the leases, when BLM deemed them to be in suspension

rather than terminated, were not the result of recent successful bids by Kirkwood. They were instead interim decisions of the agency as part of the process of deciding whether to grant Kirkwood's application for CHL leases. Accordingly, we conclude there has not been a consummation of the agency's decisionmaking process sufficient to support litigation of the issue SUWA seeks to raise.

Nor have the interim decisions had any immediate impact on SUWA. Kirkwood has taken no concrete action in decades to develop oil and gas on the leases other than to apply to convert them to CHLs. Kirkwood also has consistently disclaimed any right to engage in operations on the leases while its CHL applications are under review. In Kirkwood's view, its leases are subject to a suspension of operations, not just a suspension of the length of their respective terms, and that suspension of operations, it says, prohibits it from entering upon, exploring, or otherwise impacting the leaseholds while its CHL applications are pending.

In addition, because Kirkwood's leases have been deemed by the BLM to be under some type of suspension and their terms will not expire during the pendency of the CHL applications, 43 C.F.R. § 3103.4-4(b), Kirkwood lacks an incentive to attempt oil and gas development on the leases in the interim. There is no indication that Kirkwood intends to seek a permit to drill on the suspended leases, even if it has the legal right to do so as SUWA and the government argue, *supra* at 9-10. Kirkwood's CHL conversion applications have already been

-31-

pending for nearly thirty years. Nothing in the record suggests that during these decades Kirkwood ever sought the required drilling permits, and it denies having the current right to do so. Given Kirkwood's representations to us and to the district court that it cannot utilize the leases while its CHL applications are pending, it appears unlikely that Kirkwood will seek to engage in any oil and gas development on the leaseholds until its CHL applications are resolved.[12] Thus, the Challenged Decisions have had no immediate impact on the interests SUWA seeks to protect.

Moreover, we are not persuaded that SUWA will be harmed by delayed review. Any harm to SUWA's members' enjoyment of the lands at issue "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations omitted). Until Kirkwood receives either drilling permits on the suspended leases or decisions on the CHL applications, no oil and gas development will occur. In the meantime, SUWA's members can continue their enjoyment of the Circle Cliffs and Tar Sand Triangle STSAs without disruption by Kirkwood, and SUWA's interests in the wilderness of Southern Utah will remain uninjured by the status quo. Both Kirkwood and the government concede that if and when Kirkwood ever gains the right to engage in development on the leaseholds,

---

[12] Of course, if Kirkwood were to abandon its current position and seek permits to begin drilling operations, SUWA could challenge the issuance of such permits.

SUWA may seek review of its claim that the Challenged Decisions improperly deemed the leases suspended, along with any other issues that may arise in the remaining course of the agency proceedings.

We would also "benefit from further factual development of the issues presented." *Utah*, 210 F.3d at 1197. Although the issues here are predominantly legal questions, the validity of SUWA's claims will be best adjudicated once the facts have been further developed and it becomes clear what type of oil and gas development Kirkwood will ultimately be allowed to engage in, if any. We should not resolve the issues raised by SUWA "unless and until it is determined what rights" Kirkwood has to engage in mineral extraction on the leaseholds. *Tarrant Reg'l Water Dist.*, 656 F.3d at 1250; *see also Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1237 (10th Cir. 2004) ("Fitness for judicial resolution may depend upon . . . whether consideration of the issue would benefit from a more concrete setting . . . ." (internal quotation marks omitted)).

There is simply too much uncertainty as to when and what type of drilling, if any, will occur on the thirty-nine contested leases. SUWA "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain," *Ohio Forestry Ass'n*, 523 U.S. at 734, and it will suffer no hardship from this delayed review. Accordingly, we conclude this suit is premature.

## IV.

Because SUWA's claims are not ripe, we **REMAND** to the district court with instructions to dismiss this action without prejudice.