**UNITED STATES COURT OF APPEALS**

**April 27, 2016**

**TENTH CIRCUIT**

THE NEW MEXICO OFF-HIGHWAY
VEHICLE ALLIANCE, a New Mexico
nonprofit corporation,

       Petitioner-Appellant,

v.

UNITED STATES FOREST
SERVICE, an agency of the United
States Department of Agriculture;
THOMAS TIDWELL, in his official
capacity as Chief of the United States
Forest Service; MARIA T. GARCIA,
in her official capacity as Santa Fe
National Forest Supervisor; GILBERT
ZEPEDA, in his official capacity as
Southwestern Region Deputy Regional
Forester; UNITED STATES
DEPARTMENT OF AGRICULTURE;
TOM VILSACK, in his official
capacity as Secretary of the United
States Department of Agriculture,

       Respondents-Appellees.

————————————————

CENTER FOR BIOLOGICAL
DIVERSITY; WILDEARTH
GUARDIANS; SIERRA CLUB,

       Respondents-Intervenors.

No. 14-2135
(D.C. No. 1:12-CV-01272-WJ-GBW)
(D.N.M.)

**ORDER AND JUDGMENT**[*]

———————————————

[*]      This Order and Judgment is not binding precedent, except under the

(continued...)

Before **KELLY**, **HOLMES**, and **McHUGH**, Circuit Judges.

Until 2012, the Santa Fe National Forest was generally open to motorized use. However, recognizing the detrimental impact of motor vehicles on national parks and forests, the United States Forest Service ("Forest Service") adopted a nationwide rule requiring that only specific roads and trails on national forest land be designated for motorized use in accordance with various environmental and recreational criteria. The Forest Service then began the designation process for the Santa Fe National Forest, and, pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–47, it published an Environmental Impact Statement ("EIS") detailing the environmental effects of various alternative route systems it was considering. Ultimately, the Forest Service selected an alternative that significantly reduced the routes available for motorized use.

The New Mexico Off-Highway Vehicle Alliance ("NMOHVA") petitioned for review of the agency's decision, alleging that the EIS failed to comply with

[*](...continued)
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

NEPA in various ways. The district court upheld the agency's action, finding that it was not arbitrary or capricious. NMOHVA now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that NMOHVA failed to establish standing. Consequently, we **dismiss** this appeal and **remand** the case to the district court with instructions to **vacate** its judgment and **dismiss** the case without prejudice for lack of subject-matter jurisdiction.

# I

## A

The Santa Fe National Forest, located in northern New Mexico, encompasses over 1.5 million acres of land. Prior to 2012, fifty-three percent of the forest's total area remained presumptively open for motorized use. This meant that people could "drive where they like[d] as long as no sign or closure order post[ed] [the route] closed." Aplt.'s App. at 90 (Final Envtl. Impact Statement, prepared June 2012). Under this "open-use" regime, many visitors created their own routes on the forest "by driving repeatedly in the same tracks." *Id.* at 162. Additionally, some roads maintained by the Forest Service, but officially closed to motorized use, were nonetheless being driven on.

In 2005, the Forest Service promulgated a nationwide Travel Management Rule ("TMR") to address the growing impact of unmanaged motor vehicle use on forest land. *See* Travel Management; Designated Routes and Areas for Motor Vehicle Use, 70 Fed. Reg. 68,264 (Nov. 9, 2005) (codified at 36 C.F.R. §§

3

212.50–212.57).  The TMR requires the designation of specific routes for motorized use, and prohibits driving on roads and trails not listed on maps published by the agency.  *See* 36 C.F.R. § 261.13.  In choosing which routes remain open, the Forest Service must consider, *inter alia*, the "effects on . . . natural and cultural resources, public safety, provision of recreational opportunities, access needs, [and] conflicts among uses."  *Id.* § 212.55(a).  More specifically, the agency is directed to:

> consider effects on the following, with the objective of minimizing:
>
> (1) Damage to soil, watershed, vegetation, and other forest resources;
>
> (2) Harassment of wildlife and significant disruption of wildlife habitats;
>
> (3) Conflicts between motor vehicle use and existing or proposed recreational uses of National Forest System lands or neighboring Federal lands; and
>
> (4) Conflicts among different classes of motor vehicle uses of National Forest System lands or neighboring Federal lands. . . .

*Id.* § 212.55(b).

## B

In accordance with the nationwide TMR, the Forest Service began the process of developing a travel plan for the Santa Fe National Forest in 2006.  As part of this project, under NEPA, the agency was required to issue an EIS providing "a detailed statement" of "the environmental impact of the proposed

4

action" and "alternatives to the proposed action."  42 U.S.C. § 4332(C); *see id.* (requiring an EIS for "major Federal actions significantly affecting the quality of the human environment"); *see also* 36 C.F.R. § 212.52(a) (requiring that opportunities for public comment on proposed designations be given "consistent with agency procedures under the National Environmental Policy Act").  The EIS would compare the potential courses of action being considered by the Forest Service against "the alternative of no action," 40 C.F.R. § 1502.14(d), which would reflect "'no change' from [the] current management direction or level of management intensity," Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (codified at 40 C.F.R. §§ 1500–08);[1] *see also* 40 C.F.R. § 1502.14 (stating that the agency "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice").

To comply with its NEPA obligations, the Forest Service published a final EIS for the Santa Fe National Forest designation process in June 2012.  The agency defined the purpose of the project as (1) compliance with the TMR, and (2) a reduction in the "detrimental effects to natural and cultural resources from

---

[1]      We consider the Forty Most Asked Questions to be persuasive authority on "the meaning of NEPA and the implementing regulations."  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 705 n.25 (10th Cir. 2009).

5

unmanaged motorized use and the existence of roads and motorized trails."

Aplt.'s App. at 83. In constructing the "no-action alternative," the agency found

that its database of available routes in the forest was inadequate because, under

the open-use regime, it had not kept a detailed record of roads and trails. For

example, while it attempted to conduct an inventory using aerial photographs in

1992, this process proved over-inclusive: "fence lines and other features that

appeared to be roads" were counted as roads, and no follow-up verification was

conducted. Aplee.'s Suppl. App. at 36 (Travel Analysis Process Report, prepared

June 2008). At one point, the Service estimated that "between 10 percent and 20

percent of the roads in [its] database [did] not exist." *Id.* at 39. Further, the

"unauthorized"[2] routes that visitors to the forest had created were "not tallied in

the forest's database," and the Service did not "have an inventory of all the

unauthorized roads in the forest." Aplt.'s App. at 162.

Thus, the agency concluded that its existing data did not "capture hundreds

of existing roads and trails," Intervenors-Aplees.' Suppl. App. at 48 (Defining the

Existing Condition: Should it be reality-based or INFRA-based?), and included

routes that no longer existed on the ground. To remedy this problem, the Forest

---

[2]    The term "unauthorized" is drawn from the TMR, *see, e.g.*, Aplt.'s
App. at 424, and is used throughout the EIS to describe user-created routes.
Generally speaking, these routes are not illegal; indeed, many have been created
by motorized users in areas where driving off-road is allowed. We use the terms
"unauthorized" and "user-created" interchangeably throughout this order and
judgment.

Service decided to pursue a "reality-based," *id.*, estimate of where motorized use was actually occurring under the status quo regime, based on preexisting data, field visits, sampling and statistical calculations, and input from motorized vehicle users. The agency ultimately defined the no-action alternative as "the forest's best estimate of where people drive now, which reflects the current management and present course of action." Aplt.'s App. at 97. In a table, it provided *both* the "total miles" of routes where driving was technically allowed under the open-use policy and its calculation of the "miles being driven on." *Id.* (capitalization altered). These two figures—7,832 miles and 5,626 miles, respectively—were also presented in Appendix 2 of the EIS, which compared the miles of available routes under each of the various alternatives considered.

The Forest Service then engaged in a detailed comparison of five alternative route systems, each of which highlighted a different regulatory goal. For example, Alternative 3 emphasized resource protection, Alternative 4 prioritized motorized access, and Alternative 5 focused on reducing conflicts between motorized and non-motorized users. Alternative 2M, a version of Alternative 2 that was modified to reflect public comments, represented the agency's "preferred alternative." *Id.* at 106. The EIS also discussed eighteen other alternatives that the agency dismissed without detailed consideration because they did not achieve the purpose of the project.

7

Based on the analysis contained in the EIS, the Forest Service issued a Record of Decision ("ROD") selecting Alternative 2M, which limited the use of motor vehicles to 2,255 miles of roads, 208 miles of trails, and 41 acres for cross-country travel. However, seventy miles of these roads—mainly "unauthorized and closed forest system routes"—were not designated on the first motor vehicle use map issued by the agency because they crossed the habitat of the Jemez Mountains Salamander ("salamander"), a threatened species. Aplt.'s App. at 358 (Final Envtl. Impact Statement, prepared June 2012). The Forest Service stated that it planned to conduct site-specific surveys to mitigate the impacts of these roads on the salamander. If the adverse effects to the species or its habitat created by a particular route could not be avoided, however, the route would not be designated.

## C

NMOHVA "is a statewide nonprofit alliance of motorized off-highway vehicle enthusiasts and organizations" whose mission "is promoting, protecting and preserving responsible off-highway recreation." Aplt.'s Opening Br. at 4. NMOHVA participated in the Santa Fe National Forest designation process, suggesting various routes for inclusion, and submitting comments regarding the Forest Service's EIS analysis. After the Forest Service selected Alternative 2M, NMOHVA pursued an unsuccessful administrative appeal of the agency's decision. In its petition, NMOHVA claimed that (1) the agency had failed to

8

include a true no-action alternative because the estimated-use calculation omitted approximately two thousand miles of available routes, (2) the range of alternatives analyzed in the EIS was too narrow, (3) the agency's scientific analysis was based on flawed or unsupported assumptions, and (4) the failure to list a bulk of the trails in the salamander's habitat was arbitrary.

After briefing from the parties and certain intervening environmental groups ("Intervenors"),[3] and a hearing, the district court denied the petition, concluding that the agency's EIS analysis was not arbitrary and capricious. This appeal followed.

## II

On appeal, NMOHVA challenges four aspects of the Forest Service's EIS: (1) its construction of an estimated-use no-action alternative; (2) the range of alternatives it considered; (3) its scientific analysis of the environmental impacts of the various alternatives; and (4) its decision to withhold designation of routes crossing the salamander's habitat. At the outset, however, we must address the Intervenors' argument that NMOHVA lacks standing—and therefore that we lack jurisdiction. *See W. Energy All. v. Salazar*, 709 F.3d 1040, 1046 (10th Cir. 2013) ("[J]urisdiction is a threshold question which an appellate court must resolve

---

[3] In a previous appeal in this case, we concluded that the Center for Biological Diversity, WildEarth Guardians, and the Sierra Club had a right to intervene under Federal Rule of Civil Procedure 24(a)(2). *N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 540 F. App'x 877, 882 (10th Cir. 2013).

before addressing the merits of the matter before it." (alteration in original) (quoting *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1201 (10th Cir. 2002))). Our standing inquiry proves dispositive: we conclude that NMOHVA does not have standing; accordingly, we dismiss this appeal and remand the case to the district court with instructions to vacate its judgment and to dismiss NMOHVA's action without prejudice for lack of jurisdiction.

## A

The Intervenors allege that "NMOHVA has not proven that it has standing to pursue this litigation." Intervenors' Br. at 13. The district court found that NMOHVA's standing affidavit was too vague to establish a concrete injury, but nevertheless concluded that NMOHVA had demonstrated standing "by the slimmest of margins" based on the administrative record and representations made at a hearing. Aplt.'s App. at 33 (Mem. Op. & Order Den. Pet. for Review of Agency Action, filed July 25, 2014). Our review of the district court's standing determination is de novo. *See S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013). "If the district court lacked jurisdiction, 'we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.'" *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1163 (10th Cir. 2004) (citations omitted). After carefully examining the extensive record, we are constrained to conclude that the district erred in finding standing. Importantly, as

10

explicated below, NMOHVA had the burden to establish standing, and we conclude that it failed to do so.

**1**

The jurisdiction of the federal courts is limited by Article III of the Constitution to actual "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1. "The doctrine of standing is one of several doctrines that reflect this fundamental limitation."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *accord Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008); *see Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156–57 (D.C. Cir. 2005) ("We ascertain whether or not the matter before us is a 'case' or 'controversy' by looking to whether, *inter alia*, the litigants have 'standing.'" (citation omitted)); *see also Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014) ("The standing doctrine delineates the boundary between justiciable cases and controversies and those disputes that are not appropriately resolved through judicial process.").  Under the standing doctrine, we may only hear a case where a party can demonstrate that "it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury."  *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007); *accord Greenbaum v. Bailey*, 781 F.3d 1240, 1243 (10th Cir. 2015).

Moreover, "[s]ince federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking

11

federal jurisdiction." *Dutcher v. Matheson*, 733 F.3d 980, 985 (10th Cir. 2013) (quoting *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999)); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." (citation omitted)). Here, since NMOHVA sought federal court review of the Forest Service's action, it was incumbent on it to demonstrate the elements of standing: (1) injury in fact, (2) causation, and (3) redressability. As an organization, NMOHVA has standing to sue on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

**2**

To establish standing before the district court, NMOHVA submitted the affidavit of Mark R. Werkmeister, a member of its board of directors. In this brief affidavit, Mr. Werkmeister only stated that he "recreated on the Santa Fe National Forest using [his] off-highway vehicle and . . . plan[ned] to return to the National Forest . . . in the future." Intervenors-Aplees.' Suppl. App. at 7 (Standing Decl., filed Mar. 4, 2014). The district court correctly found that the

12

cursory averments in this affidavit were insufficient to establish a concrete and particularized injury that was either actual or imminent.

Mr. Werkmeister's affidavit is clearly deficient in two ways. First, "to establish standing plaintiffs must show that they 'use the area affected by the challenged activity and not an area roughly in the vicinity of'" the activity. *Summers*, 555 U.S. at 499 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566 (1992)). Yet Mr. Werkmeister does not state that he has used, or intends to use, any particular route affected by the designation process. *See id.* (concluding that averments that an organization's members "use[d] and enjoy[ed]" a forest without identifying any "specific site[]" were insufficient). Given the immense size of the forest (over 1.5 million acres), and the thousands of miles of routes available under both the open-use regime and the selected Alternative 2M, it is *possible* that Mr. Werkmeister's "wanderings will bring him to a [route] . . . affected by . . . the regulations," *id.* at 495—but it is patent that NMOHVA has not demonstrated that this outcome is *imminent*. While Mr. Werkmeister did not need to allege that he has "traversed each bit of land that will be affected by" the designation process, he did at least have to show that he has "visited a *particular* site" affected by the Forest Service's actions. *S. Utah Wilderness All.*, 707 F.3d at 1155, 1156 (emphasis added); *cf. id.* at 1156 (concluding that the affiant had adequately demonstrated injury where he "specified areas which he has visited,

13

averred that these specific areas will be affected . . . , and stated his interests will be harmed by such activity").

Second, the affidavit only states a vague plan to visit the forest "in the future." Intervenors-Aplees.' Suppl. App. at 7. But such "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of . . . 'actual or imminent' injury." *Defs. of Wildlife*, 504 U.S. at 564; *accord Colo. Outfitters Ass'n v. Hickenlooper*, --- F.3d ----, Nos. 14–1290, 14–1292, 2016 WL 1105363, at *9 (10th Cir. Mar. 22, 2016); *see, e.g.*, *Summers*, 555 U.S. at 496 (concluding that an affidavit fails to establish an imminent injury where "[i]t does not assert[] . . . any firm intention to visit [an affected] location[]"); *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004) (stating that "a concrete, *present* plan to use" the affected facilities was sufficient to state an injury in fact); *cf. WildEarth Guardians v. EPA*, 759 F.3d 1196, 1206 (10th Cir. 2014) (concluding that an affiant's plans were sufficiently concrete where he "intend[ed]" to return to the affected river "in June and July of this summer" (citation omitted)). Thus, the district court correctly concluded that Mr. Werkmeister's affidavit was insufficient to establish standing.

To be sure, in an attempt to rectify the failings of its original standing affidavit, NMOHVA submitted a supplemental standing affidavit with its opening appellate brief. This affidavit, however, was not presented to the district court;

14

consequently, we will not consider it. *United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000) ("This court will not consider material outside the record before the district court."). Standing must be present "at the outset of the litigation" in the district court, *Friends of the Earth*, 528 U.S. at 180; *see Mink v. Suthers*, 482 F.3d 1244, 1253–54 (10th Cir. 2007) ("But standing is determined at the time the action is brought, and we generally look to when the complaint was first filed, not to subsequent events." (citation omitted)). And, if plaintiffs have not been successful in demonstrating standing "at the time [the district court enters] judgment," they cannot "remedy the defect retroactively." *Summers*, 555 U.S. at 495 n.* (declining to consider post-judgment standing affidavits submitted to the district court); *see Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) ("In determining whether the companies have standing, the court may not consider on appeal supplemental declarations filed after entry of the judgment appealed.").

**3**

The district court ultimately found that NMOHVA had standing based on "representations made during [a] hearing" regarding its submission of specific routes for designation. Aplt.'s App. at 32. The court also determined that "NMOHVA . . . presented in the administrative record a pattern of use sufficient to meet the imminence requirement for standing." *Id.* at 33. But precisely what representations the district court found persuasive, and which parts of the

15

administrative record it believed established a "pattern of use," *id.* at 33, is not immediately apparent to us: the district court's order does not provide any specifics, and, importantly, NMOHVA has neither provided us a transcript of the hearing before the district court, nor directed us to any document in the record establishing a concrete and particularized injury.

**a**

As we have already indicated, since NMOHVA seeks to invoke our jurisdiction, it "bears the burden of proof" on the issue of standing. *Loving v. Boren*, 133 F.3d 771, 772 (10th Cir. 1998). By providing us a lengthy administrative record without any indication of where we might look to identify a concrete injury to NMOHVA, it has not carried its burden; NMOHVA has, in effect, asked us to shoulder its responsibility. Yet it is emphatically "not this court's duty to scour without guidance a voluminous record for evidence supporting [a litigant's] theory." *United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir. 2010); *see Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003) ("We need not sift through the record to find [evidence to support a party's argument] . . . ." (alteration in original) (quoting *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513 (10th Cir. 1990))); *see also Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in [the record]." (alteration in original) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam))). Simply put, "reading a record

16

should not be like a game of Where's Waldo?  And it is within our power as a court to refuse to consider an argument in these circumstances."  *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir. 2008) (citation omitted).[4]

There are good institutional and practical reasons for our reluctance to wade through reams of record documents without any guidance from the parties. First, under our adversarial system of justice, we "rely on lawyers to identify the pertinent facts and law."  *In re Cont'l Cas. Co.*, 29 F.3d 292, 295 (7th Cir. 1994); *see Niemi v. Lasshofer*, 728 F.3d 1252, 1259 (10th Cir. 2013) ("In our adversarial system we don't usually go looking for trouble but rely instead on the parties to identify the issues we must decide.").  We do not act as advocates for parties, and we will not typically search out the facts necessary to support a litigant's position.  *See Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000) ("[W]e 'are wary of becoming advocates who comb the record . . . and make a party's case for it.'" (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998))); *accord Eateries*, 346 F.3d at 1232.

Moreover, we have limited resources, and can ill afford to go on a treasure hunt in the record without doing a disservice to other litigants.  *See DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000) (admonishing counsel for "wasting th[e] Court's limited resources" by submitting briefs without "even

---

[4]    In fact, the Federal Rules of Appellate Procedure and this court's local rules require litigants to direct us to relevant parts of the record in their appellate briefs.  *See* Fed. R. App. P. 28(a)(8)(A); 10th Cir. R. 28.2(C).

rudimentary citations to the record"); *see also In re McDonald*, 489 U.S. 180, 184 (1989) (per curiam) ("Every paper filed with the Clerk of this Court[] . . . requires some portion of the institution's limited resources."). We are thus dismayed by NMOHVA's complete failure to provide us with any record citations to support its standing.[5]

**b**

At this juncture in the litigation, a conclusion that NMOHVA lacks standing would certainly be regrettable. The able district court judge and the parties have expended considerable resources addressing the merits of this dispute. Therefore, notwithstanding NMOHVA's dereliction, we have scoured the extensive administrative record in this case, attempting to discern whether NMOHVA has suffered a sufficiently concrete and particularized injury to establish its standing. Despite devoting considerable time to this endeavor, we

---

[5] We also echo the district court's frustration that the Forest Service was "not prepared and thus took no position on whether NMOHVA has standing [to] bring this suit. While the [government] may have unlimited resources to expend litigating a case . . . when there is potentially no subject matter jurisdiction, the Court does not have such resources." Aplt.'s App. at 33. Indeed, given that the district court chastised the parties for their failure to adequately address standing, and that the Intervenors raised standing in their appellate brief, we are troubled that neither the Forest Service nor NMOHVA was better prepared to address standing on appeal. At oral argument, counsel for the Forest Service appeared to confuse the two affidavits submitted by NMOHVA—the one prior to the district court's judgment and the supplemental one that NMOHVA attached to its appellate brief—while counsel for NMOHVA directed us to its reply brief, which only references the supplemental affidavit that we have already rejected as not properly part of the record we can consider.

18

have come up short. We must conclude that NMOHVA's standing has not been demonstrated. If there is in fact a standing needle buried in the haystack of this record, the blame for our failure to find it rests squarely at the feet of NMOHVA.

Federal courts scrupulously guard the boundaries of their jurisdiction; they are duty-bound not to permit a standing determination to rest on speculation or conjecture. *See, e.g.*, *Summers*, 555 U.S. at 499 (stating that, in determining standing, "speculation does not suffice"); *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1233–34 (10th Cir. 2012) ("The petitioners have failed to meet their burden of showing an injury in fact. Record facts consisting of conclusory statements and speculative economic data are insufficient to lead us to any other conclusion. Accordingly, we hold Petitioners lack standing to bring this civil action."); *Tandy*, 380 F.3d at 1283–84 ("A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction."); *see also Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1157 (10th Cir. 2005) ("The plaintiff's burden of demonstrating causation is not satisfied when '[s]peculative inferences are necessary to connect [its] injury to the challenged actions.'" (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45–46 (1976))).

In our laborious search, we did discover a piece of evidence that, at first blush, offered some hope of providing a solid foundation for NMOHVA's standing, but ultimately we have concluded that it cannot bear the jurisdictional

19

weight.  Specifically, we focused on a brief passage in the EIS in which the Forest Service explained why it chose not to analyze an alternative request submitted by the "Blackfeather Trail Preservation Alliance ["Blackfeather"], a subgroup of" NMOHVA.  Aplt.'s App. at 132.  NMOHVA could have standing based on Blackfeather—a NMOHVA member that is itself an organization—if Blackfeather's members were injured as a result of the designation process.  *See N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 9–10 (1988) (stating, in a case involving a consortium of various clubs, that the consortium would have standing if the "member associations would have standing to bring . . . suit on behalf of their own individual members").

Blackfeather requested in this EIS passage "a large network of single-track trails and tr[ai]ls riding areas, mainly in the Jemez Mountains."  Aplt.'s App. at 132.  The Forest Service's somewhat laconic response suggested that, although it included some of Blackfeather's requested trails in what ultimately became the preferred alternative (i.e., 2M), it also designated many of them for alternatives that were not selected, "especially in alternative 4."  *Id.* at 133.  This suggests the possibility that Blackfeather was injured by the designation process because the Forest Service apparently did not include some of its requested trails in the preferred alternative.

However, even if we could be confident—which is a hard state of mind to achieve without any argument or other guidance from NMOHVA—that our

20

interpretation of this brief passage is correct, *see, e.g.*, *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 231 (1990) ("[S]tanding . . . 'must *affirmatively* appear in the record.'" (emphasis added) (citation omitted)), the passage is problematic and ultimately insufficient as proof of standing. It does not indicate with any specificity which of Blackfeather's requested trails may have been omitted from the preferred alternative. And, even if this information could somehow be gleaned from the record, there is a more fundamental problem, which is dispositive: the passage offers no indication of whether Blackfeather's members regularly use, and have concrete plans to return to, the requested trails.

This evidentiary deficiency as to the use and planned use of the affected area, viewed alone, renders the EIS passage insufficient to establish NMOHVA's standing through Blackfeather, just as this type of defect doomed NMOHVA's attempt to establish standing in the district court through the averments of Mr. Werkmeister's affidavit. *See, e.g.*, *Summers*, 555 U.S. at 496 (concluding that an affidavit fails to establish an imminent injury where "[i]t does not assert[] . . . any firm intention to visit [an affected] location[]"); *Colo. Outfitters Ass'n*, 2016 WL 1105363, at *7 (in holding that plaintiffs had not established standing, commenting that "we see no evidence indicating they had even a general intent to engage in conduct that might violate [the state statute at issue], let alone any specific plans to do so"); *Tandy*, 380 F.3d at 1284 (stating that "a concrete, *present* plan to use" the affected facilities was sufficient to state an injury in

21

fact); *see also Friends of the Earth*, 528 U.S. at 183 ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the . . . recreational values of the area will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972))). In other words, this evidence does not demonstrate that Blackfeather's members have "a 'direct stake in the outcome'" of the present dispute, *S. Utah Wilderness All.*, 707 F.3d at 1155 (quoting *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451 (10th Cir. 1996)). And, therefore, NMOHVA cannot establish standing through Blackfeather. Thus, in our view, what is perhaps the most promising piece of evidence that we unearthed in the record for establishing NMOHVA's requisite injury is insufficient; it will not take NMOHVA across the jurisdictional finish line.[6]

---

[6] The EIS passage containing Blackfeather's site request was one of a few documents meriting further study—all of them proved insufficient to establish standing. Our review underscores why courts are loath to play detective, hunting down clues in the nooks and crannies of the administrative record. At best, those documents worthy of further study were plagued by similar problems as the Blackfeather EIS passage. For example, in a document titled "Report on Site Specific Suggestions," which summarizes comments received by the Forest Service regarding the designation of various trails, Mr. Werkmeister unsuccessfully requested that the "routes in the Cuba District like the Smokey Bear Hill loops" be designated for motorized use. Aplee.'s Suppl. App. at 246 (Report on Site Specific Suggestions). He noted that NMOHVA members are "frequent visitors to the area in [their] vehicles and hope to continue this important tradition for many years to come." *Id.* The Forest Service excluded this area from the alternatives, noting that Mr. Werkmeister's "suggestion is vague, [and that] also concerns with wildlife issues exist in this area." *Id.* While Mr. Werkmeister's comment does endeavor to identify (albeit vaguely) particular

(continued...)

22

**c**

In sum, we are constrained to conclude that NMOHVA lacked standing and, consequently, the district court did not have subject-matter jurisdiction to rule on the merits of this case. Our precedent charts the path forward. We are constrained to dismiss this appeal and remand the case to the district court with instructions to vacate its judgment and dismiss NMOHVA's lawsuit without prejudice. *See, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1102 (10th Cir. 2007) ("[W]e hold that plaintiffs lack standing to bring claims against Swensen based upon the purported unconstitutionality of Utah's criminal prohibition of polygamy. We therefore **VACATE** the district court's judgment in favor of Swensen on the merits of these criminal-prohibition claims and **REMAND** the case for entry of an order dismissing these claims for lack of subject matter jurisdiction."); *Estate of Harshman*, 379 F.3d at 1168 ("The only function left to

---

[6](...continued)
routes used by NMOHVA members that were excluded from motorized use, it suffers from similar deficiencies as the passage containing the Blackfeather site request. Specifically, it expresses only a vague desire that members "hope" to return "for many years to come." *Id.* Absent concrete plans to return to the affected trails, this comment is inadequate to meet the injury-in-fact requirement. *See Summers*, 555 U.S. at 496 (concluding allegations of injury insufficient where the affiant only expressed a "vague desire to return" to the affected area); *Defs. of Wildlife*, 504 U.S. at 564 n.2 (noting that an intent to return "at some indefinite future time" is insufficient for purposes of standing); *see also Colo. Outfitters Ass'n*, 2016 WL 1105363, at *9 ("Such 'some day' speculations are insufficient to establish an injury-in-fact for purposes of Article III standing." (quoting *Defs. of Wildlife*, 504 U.S. at 564)).

us is to announce the fact that the district court lacked jurisdiction to grant summary judgment for Jackson Hole.  Accordingly, we **VACATE** the district court's grant of summary judgment for Jackson Hole, and **DISMISS** this appeal."); *Utah v. Babbitt*, 137 F.3d 1193, 1197 (10th Cir. 1998) ("Because we conclude that Plaintiffs lack standing to challenge the inventory, we vacate the preliminary injunction and remand with instructions to dismiss the seven causes of action directly related to the inventory . . . ."); *see also United States v. Ramos*, 695 F.3d 1035, 1051 (10th Cir. 2012) ("holding that we do not have subject-matter jurisdiction over Mr. Ramos's constitutional challenges" and, regarding that portion of the appeal, entering an order to "**DISMISS** the appeal in part").

### III

For the foregoing reasons, we **DISMISS** this appeal and **REMAND** the case to the district court with instructions to **VACATE** its judgment and **DISMISS** NMOHVA's action without prejudice for lack of subject-matter jurisdiction.

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

24