**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 30, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LISA CALDERÓN,

      Plaintiff - Appellant,

v.

CITY AND COUNTY OF DENVER;
MICHAEL HANCOCK; PATRICK
FIRMAN; JESS VIGIL; ANDREA
ALBO,

      Defendants - Appellees.

No. 19-1388
(D.C. No. 1:18-CV-00756-PAB-MEH)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **MATHESON**, **BRISCOE**, and **MURPHY**, Circuit Judges.

## I. INTRODUCTION

For nearly a decade, Lisa Calderón served as Executive Director of the

Community Reentry Program ("CRP"). During that time, CRP administered the

Transition from Jail to Community Program ("TJCP"), a program created by the

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

City and County of Denver ("Denver") to provide transitional services to adult Denver residents released from the Denver County Jail and Downtown Detention Center. CRP was chosen to administer the TJCP in 2007 and this arrangement was renewed on an annual basis until March of 2018. Denver then chose a coalition of organizations to replace CRP as administrator of the TJCP. Calderón brought a 42 U.S.C. § 1983 suit against Denver and several Denver officials (referred to collectively as Denver), claiming the decision to displace CRP as administrator of the TJCP violated her First and Fourteenth Amendment rights.

The district court dismissed Calderón's complaint, concluding she lacked prudential standing because her claims were derivative of claims belonging to CRP and/or CRP's fiscal agent, the Colorado Nonprofit Development Center ("CNDC"). Calderón appeals, asserting the district court erred in concluding she lacks prudential standing to bring her constitutional claims against Denver. She further asserts, although recognizing that she did not directly and clearly raise the issue below, the issue of prudential standing is not implicated in this case because (1) CRP was not a distinct entity, such as a corporation, but instead merely the vehicle by which Denver contracted with her to administer the TJCP and (2) CNDC had no interest in the contract because it was simply a fiscal agent used by Denver to disburse funds to CRP.

This court concludes it is unnecessary to address the difficult and complex issue of prudential standing because Calderón's complaint plausibly alleges she is the contractor and, thus, her claims are not derivative of claims belonging to CRP or CNDC.[1] This court exercises its discretion to resolve Calderón's appeal on this ground, even though it was not clearly and directly raised below. Whether Calderón's complaint states a plausible claim that the contract at issue belongs to her is a question of law. Furthermore, this court's strong institutional interest in avoiding the unnecessary resolution of hypothetical and entirely abstract issues of constitutional magnitude strongly outweighs any countervailing interests against addressing an issue raised for the first time on appeal. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **reverse** the district court's order of dismissal and **remand** the matter to the district court for further proceedings.

---

[1]In response to Denver's motion to dismiss, Calderón filed a declaration under oath, elaborating on factual matters alleged in her Complaint. Denver responded, but did not challenge the factual testimony in the declaration. Instead, it asserted those facts did not establish Calderon was a city employee, a matter that is likely impertinent and, at best, peripheral. For purposes of addressing Calderón's claim she was a Denver employee, the district court refused to consider the material set out in her declaration. Dist. Ct. Order at 18. Notably, however, there is no hint of an employment relationship between Denver and Calderón in Calderón's complaint. *See id.* As noted below, however, Calderón's complaint does plausibly allege her claims are not derivative of claims belonging to either CRP or CNDC because she was a direct Denver contractor. In that limited regard, the uncontested allegations in her declaration are highly relevant to the resolution of this appeal.

## II. BACKGROUND

### A. Legal Background

"Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'" *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). "One essential aspect of this requirement," and the only one at issue in this appeal, "is that any person invoking the power of a federal court must demonstrate standing to do so." *Id.* "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Id.*

"In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a case or controversy between himself and the defendant within the meaning of Art. III." *Id.* (quotation omitted). "As an aspect of justiciability, the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498–99 (quotation omitted). "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection

between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quotations and alteration omitted). As was true before the district court, Denver does not dispute on appeal that Calderón has Article III standing to bring her constitutional claims. Nor can this court conceive of any reason to conclude Calderón lacks constitutional standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (noting that a federal court has "an obligation" in every case to "assure [itself] of litigants' standing under Article III" (quotation omitted)).

Prudential standing, in contrast, represents "judicially self-imposed limits on the exercise of federal jurisdiction." *Hill v. Warsewa*, 947 F.3d 1305, 1309 (10th Cir. 2020) (quotation omitted). "Under the prudential standing doctrine, a party may not rest its claims on the rights of third parties where it cannot assert a valid right to relief of its own." *Id.* at 1309–10 (quotations omitted).[2]

---

[2]As noted at some length in *Hill v. Warsewa*, the doctrine of prudential standing has recently undergone significant evolution. 947 F.3d 1305, 1308–09 (10th Cir. 2020). "Traditionally, the doctrine encompassed three broad principles: '[1] the general prohibition on a litigant's raising another person's legal rights, [2] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and [3] the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Id.* at 1309 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). In *Lexmark*, however, the "Court concluded that the zone of interests test is not prudential in origin and is indeed not a standing inquiry at all,

(continued...)

"Accordingly, a party may suffer a cognizable injury but still not possess a right to relief. Injury to a party's interest for the purposes of constitutional standing does not automatically confer prudential standing." *Id.* at 1310 (quotations, citation, and alteration omitted). The third-party standing rule is based on the assumption that "the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Additionally, "[i]t represents a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the courts might be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Id.* (citations and quotations omitted).

---

[2](...continued)
while the generalized grievance test is properly part of the Article III constitutional standing inquiry." *Hill*, 947 F.3d at 1309. *Lexmark*, however, left the third-party standing rule's "proper place in the standing firmament [to] await another day." 572 U.S. at 127 n.3. *Hill* held that this court will "continue to analyze third party standing as an element of prudential standing and apply our pre-*Lexmark* decisions bearing on that analysis." 947 F.3d at 1309. Notably, the third-party standing rule is the only aspect of prudential standing at issue in this case.

**B. Factual Background**[3]

In 2007, Denver created the TJCP to provide services for adult inmates transitioning from jail to the community. Calderón, a "Latina/African-American female," was a member of the committee that created the TJCP. Calderón was also co-chair of the Colorado Latino Forum (the "Forum"), "an organization dedicated to increasing the political, social, educational[,] and economic strength of Latinas and Latinos." Appellant's App. at 11. Denver designated CRP with community collaborators as the organization that would carry out the TJCP. Denver contracted with CRP through CRP's financial agent. From its inception in 2007 until December 2017, CRP administered the TJCP under a series of one-year contracts that were renewed automatically, with the exception of 2011 when Denver issued a Request for Proposal ("Request") for the TJCP. During this entire time-frame, Calderón led the TJCP as CRP's Executive Director.

In the summer of 2017, Calderón spoke publicly and to Denver Mayor Michael Hancock, privately, about possible race discrimination in the sheriff's department and the management of the city jail. In particular, on June 15, 2017, Calderón spoke about these issues as part of a press release from the Colorado

---

[3]This factual recitation is drawn from Calderón's complaint, as well as the TJCP contracts attached to Denver's motion to dismiss. *See infra* n.8.

Latino Forum and other groups.[4] Calderón also raised many of these issues in a private meeting with Hancock on August 14, 2017. In June 2017, officials in various city offices, including the Mayor's office, City Attorney's office, Department of Safety, and Sheriff's Department, discussed "terminating Calderón and CRP's contract" to administer the TJCP. Jess Vigil, who was at all relevant times Denver's Deputy Manager of Public Safety, spoke to other officials numerous times about "terminating the CRP contract because of Calderón's activism and criticism of [Denver] officials." Appellant's App. at 15. Vigil stated "that Calderón deserved to lose the contract and . . . had brought the termination of the CRP contract on herself." *Id.* During a meeting on August 14,

---

[4]According to Calderón's complaint, her speech on June 15, 2007, related to the following issues:

(i) discrimination against African Americans in the Sheriff Department, including the Sheriff's reorganization of the Sheriff Department to exclude African Americans and Latinos from executive leadership; (ii) conditions at and management of the City's jail by the Sheriff Department, including but not limited to Sheriff Patrick Firman's ongoing leadership failures to adequately address jail overcrowding and rising assaults; and (iii) necessary changes in the management of jails, including diversifying [the Department's] executive leadership team to culturally reflect the staff and inmate population, increasing community engagement, addressing deputy fatigue to reduce excessive force incidents, reducing the jail population and rising assaults, creating more humane conditions for inmates by expanding mental health, medical, educational and reentry services, and enacting proportional discipline practices.

2017, Hancock stated "he was 'personally offended' and 'stung' by [Calderón's] criticisms of his and [another executive staffer's] treatment of African American staff." *Id.*

In July 2017, after six years of automatically renewing CRP's contract to administer the TJCP, Denver issued a formal Request for Proposal (the "Request") for the TJCP. According to Calderón, it did so despite the fact there "were no issues with Calderón['s] and CRP's performance under" the contract to administer the TJCP. *Id.* at 14. She alleges Denver officials "set up a sham and pre-determined process for issuing and processing" the Request for the TJCP. *Id.* at 16. For example, Calderón was not included on the distribution list for the Request and employees of the Sheriff's Department actively recruited organizations other than CRP to participate in the bidding process. Furthermore, the initial committee considering applications submitted pursuant to the Request included board members of organizations applying for the contract to administer the TJCP. Calderón alleges the President of the Denver City Council and an employee of Denver Human Services told relevant Denver decision makers[5] "that

_____

[5]The process for reviewing applications for a Denver contract such as the contract to administer the TJCP involves four steps. First, the Crime Prevention and Control Commission reviews the applications and makes recommendations to the Executive Director of Denver Human Services. Second, the Executive Director reviews and rubberstamps the recommendation to the Mayor. Third, the Mayor selects the contractor and sends a proposed ordinance to the City Council.
(continued...)

CRP had failed in its performance of the [TJCP] contract, a fact that was not true in any respect." *Id.* at 17–18. After learning about the Request from a Denver employee, Calderón applied on behalf of CRP and its fiscal agent, for renewal of the contract to administer the TJCP. Calderón was the only woman to respond to the Request.

On October 18, 2017, the review committee recommended that a coalition of organizations be awarded the contract to administer the TJCP. Calderón warned Denver officials that the recommended organizations had a pattern and practice of being hostile toward women. For that reason, Calderón told the officials that requiring CRP's all-female staff to collaborate with those organizations during the transition would put CRP staff members at risk of harm. According to Calderón, Denver officials sought to discredit her by spreading the false and malicious rumor that she had spoken out about the demotion of an African American Sheriff Division Chief because she was having an affair with him. Denver City Council members Debbie Ortega and Rafael Espinoza expressed concerns about the Request process. Ortega questioned whether the contract to administer the TJCP needed to be put out for bid and noted the

[5](...continued)
Finally, the Denver City Council votes to accept the proposed ordinance, with little review or question. The mayor is the final decision maker in the contracting process.

contract was being treated differently from another contract that had been in place since 2003. Espinoza stated that Denver's "advancement of the contract did not 'pass the smell test'" and indicated that putting the contract up for bid would be a good way to retaliate against Calderón. *Id.* at 18–19. Nevertheless, following approval of the committee's recommendation by Denver's Human Services Director and Hancock, the contract to administer the TJCP was formally awarded to the recommended coalition of organizations on March 19, 2018.

## C. Procedural Background

Shortly after Denver declined to renew CRP's contract to administer the TJCP, Calderón initiated this 42 U.S.C. § 1983 civil rights suit. She alleged Denver's actions surrounding the process of awarding the 2018 contract to administer the TJCP deprived her of her First Amendment right to be free from speech-based retaliation and her Fourteenth Amendment equal protection and due process rights to be free from sex-based discrimination. Calderón asserted she "suffered economic losses from [Denver's] refusal to renew the CRP's contract to provide transition from jail to community services, including but not limited to lost wages and benefits and lost reputation, as well as emotional and physical suffering." Appellant's App. at 21.

Denver moved to dismiss Calderón's complaint, arguing, inter alia, that Calderón lacked prudential standing to raise her First and Fourteenth Amendment

-11-

claims because those claims were derivative of claims belonging to CNDC. In support of this argument, Denver attached copies of the various contracts and addenda thereto entered into by Denver and CNDC.

In her opposition to Denver's motion to dismiss, Calderón began by noting Denver's prudential-standing arguments revolved around "an apparent effort to explain the contracting entities involved here." In that regard, Calderón argued that her complaint, the relevant contract, and a declaration attached to her opposition demonstrated CRP was not an entity or employer of any kind, but was instead a program controlled entirely by Denver. Furthermore, Calderón's declaration made clear that CRP was "eliminat[ed]" when Denver terminated its relationship with her. As to CNDC, Calderón asserted as follows:

> Because [Denver] could not directly run a non-profit community-based group, [Denver] designated a fiscal entity for the CRP. Over the years, [Denver] designated three different fiscal agents for CRP, the last being CNDC. CRP had no authority to determine the fiscal agent. [The contracts attached to Denver's motion to dismiss] specif[y] that CNDC is responsible for Human Resources services for the CRP, including benefit enrollment, payroll functions, insurance and billing of payroll costs.

Aplt. App. at 117–18 (record citations omitted). Although Calderón's response sought to correct the record as to the status of the entities at issue, it never directly asserted that the true status of the entities rendered her claims non-derivative. Although the import of Calderón's factual assertions (i.e., CRP was nothing more than a Denver program with no independent status and CNDC was a

-12-

mere fiscal agent of Denver with no ownership interest in the contract to administer the TJCP) was that she was the direct and appropriate party to bring her constitutional claims, she never directly argued that point in opposing Denver's motion to dismiss. Instead, she argued she had a direct interest as a Denver employee. Calderón's complaint, however, is better directed, referring to herself as the contractor, *see* Aplt. App. at 19 (complaint at paras. 37, 38), and asserts the contract belonged to her (or to her *and* CRP), *see id.* at 15 (complaint paras. 27, 28, 29).

In its reply in support of its motion to dismiss, Denver did not deny as factually inaccurate the information in Calderón's response and declaration or argue that information was irrelevant because it was not contained in the complaint. Instead, Denver simply asserted the contracts between Denver and CNDC demonstrated Calderón's constitutional claims were derivative of claims belonging to CNDC. Notably, in so arguing, Denver did not assert CNDC was something more than a fiscal agent and did not identify any authority, from Colorado or otherwise, standing for the proposition that a fiscal agent has any ownership interest in an underlying contract it administers. *See generally Fiscal Agent* Black's Law Dictionary (9th ed. 2009) (providing that a "fiscal agent" is a

"bank or other financial institution that collects and disburses money and services as a depository of private and public funds on another's behalf").[6]

In a lengthy order, the district court granted Denver's motion to dismiss. The court concluded that although the entity status of CRP and CNDC was unclear, that fact was immaterial because "Calderón did not enter into a contract with [Denver] on her own behalf." The district court then undertook an extensive analysis of the question of prudential standing. It began by noting the parties had relied on cases applying the shareholder standing rule and that "neither had addresse[d] whether it is appropriate to apply the rule in cases, such as this one, where the plaintiff is an employee rather than a shareholder of the corporation." The district court then proceeded to resolve that issue by relying exclusively on precedent originating outside the Tenth Circuit. The court further noted that there was no uniform rule on how the doctrine applied to individuals asserting a violation of their individual constitutional rights. Nevertheless, the district court resolved each of these open questions in favor of Denver and dismissed Calderón's complaint for lack of prudential standing.

---

[6]Neither party has provided this court with any relevant Colorado authority, and we have not discovered any, defining the term fiscal agent, let alone in a way that would create a questions as to whether CNDC has any ownership interest in the TJCP contracts.

## III. ANALYSIS

### A.  Standard of Review

This court reviews questions of standing de novo. *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013).  In undertaking the review, this court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth,* 422 U.S. at 501.  It is the plaintiff's responsibility to "allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers" under both Article III and prudential standing rules. *Id.* at 518.  That is, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to plausibly state a claim that falls within the parameters of the federal courts' prudential standing limitations. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### B.  Discussion

In her opening brief on appeal, Calderón begins by asserting "[b]ecause this case revolves around the interests asserted—and specifically whether the interests asserted in this lawsuit are derivative of a third party entity—it is important to clarify the entity involved here."  Appellant's Opening Br. at 14–15.  Calderón then emphasizes that neither CRP nor CNDC can be viewed as having a primary

-15-

interest in the contract. She so asserts as to CRP because it was merely a Denver

program that ceased to exist when Calderón's contract to administer the TJCP was

not renewed and as to CNDC because it was nothing more than a fiscal agent with

no ownership interest in the contract to administer the TJCP.[7] In

---

[7] In support of this assertion as to CNDC, Calderón directs this court to CNDC's website. CNDC's website describes its essential nature as follows:

> Welcome to the Colorado Nonprofit Development Center (CNDC). Our mission is to enable all Colorado communities to thrive by maximizing the impact of nonprofits through our fiscal sponsorship.
>
> **Understanding Fiscal Sponsorship**
>
> Fiscal Sponsorship is a formal arrangement that allows charitable organizations to operate under the umbrella of CNDC's legal and tax status without having to form their own 501(c)(3).
>
> With CNDC, sponsored charitable organizations (which we call Projects) can focus on implementing mission-based programs and services while we take care of the management functions of finance, human resources, legal compliance, and risk management.
>
> This unique partnership allows Projects to launch their programming quickly, leveraging CNDC's nonprofit management expertise, robust back-office infrastructure and technical assistance to equip them for success, and strengthen their ability to impact the communities they serve.

https://cndc.org/ (last visited Feb. 1, 2021). Furthermore, in the "What We Do" section of CNDC's website, the entity is described as follows:

> CNDC provides fiscal sponsorship to select charitable organizations in Colorado.

(continued...)

-16-

response to these arguments, Denver notes that none of the information as to CRP's entity/non-entity status is set out in Calderón's complaint and that none of her arguments before the district court centered on that status. *See* Appellee's Response Br. at 16. In reply, Calderón recognizes she "did not specifically raise

---

[7](...continued)
**How Fiscal Sponsorship Works**

Fiscal Sponsorship is a formal arrangement that allows charitable organizations to operate under the umbrella of CNDC's legal and tax status without having to form their own 501(c)(3). Through a rigorous vetting process, CNDC identifies charitable organizations for fiscal sponsorship that are well positioned to benefit their communities. These organizations receive our fiscal sponsorship and become known as a 'Project' under the umbrella of CNDC's 501(c)(3). We take care of the management functions of finance, human resources, legal compliance, and risk management, freeing them to focus on their missions. They split the fee for these services with other Projects, which lowers the cost substantially.

**Why Fiscal Sponsorship**

CNDC helps Projects make the best use of precious resources. Our fiscal sponsorship increases their capacity to do more, faster – all while demonstrating fiscal responsibility and accountability to their stakeholders. With our expert counsel, sophisticated back office infrastructure and organizational guidance, Projects are better equipped to grow their programming and expand their reach in the community. . . .

https://cndc.org/what-we-do/ (last visited Feb. 1, 2021). Although this court need not consider this extra-record material in resolving this appeal, this information certainly supports Calderón's assertion that CNDC, as a fee-paid fiscal agent, does not hold any ownership interest in the contract to administer the TJCP.

the legal issue of the status of the entities at issue here [i.e., CRP and CNDC)] in the [d]istrict [c]ourt." Appellant's Reply Br. at 16. Nevertheless, she notes as follows:

> In its [r]esponse [b]rief, however, [Denver] consistently refers to CRP as having rights and injuries. Although these statements probably do not represent material errors, [Calderón] is allowed to correct those factual assertion in this [r]eply.
>
> As pointed out above in [Calderón's] [r]esponse to [Denver's] [s]tatement of the [c]ase, as well as in [Calderón's] [c]omplaint and response to [Denver's] motion to dismiss below, "CRP" stands for the Community Reentry Project. It was not an independent entity, but rather, a [Denver] program. That program was administered by a fiscal agent because [Denver] could not contract with itself. The Program was terminated in 2017.

*Id.* at 17–18.

We conclude this is one of those rare cases where it is appropriate to resolve this appeal on the basis of a ground raised only tangentially by the appellant before the district court. *See generally United States v. Jarvis*, 499 F.3d 1196, 1201–02 (10th Cir. 2007) (explaining when it is appropriate to so act). Furthermore, this court concludes that failure to address this question would amount to a manifest injustice. *See generally Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1128–29 & n.3 (recognizing this court's discretion to address any new issue not waived before the district court, but indicating that doing so is only appropriate if, inter alia, the failure to address the new issue will result in a manifest injustice). In particular, as set out above, it is a question of law whether

-18-

Calderón's complaint states a plausible claim that she was directly injured by Denver's actions as the contractor administering the TJCP who was denied renewal of the contract based on her speech and sex.[8]  Furthermore, as demonstrated by the district court's lengthy analysis of the issue, resolving this appeal by applying the doctrine of prudential standing to the abstract and questionable assumptions set out in Denver's motion to dismiss (i.e., Calderón is a mere employee of some undefined type of government contractor), is fraught with difficulty and uncertainty.  As noted by the district court, there is no binding Tenth Circuit precedent to aid the resolution of unanswered questions at several steps of the analysis.  In addition, as set out above in Section II.A., the doctrine of prudential standing, although not constitutionally mandated, implicates important institutional interests of the judiciary.  It behooves this court to avoid answering such questions unless absolutely necessary.  *Cf. Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we

---

[8]In construing Calderón's complaint, the district court concluded it was appropriate to consider the TJCP contracts attached to Denver's motion to dismiss because they were mentioned in the complaint, were central to Calderón's claims, and not asserted to be inauthentic.  *See Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013).  No party disputes the appropriateness of such an approach.  Thus, in considering whether Calderón's complaint states a plausible claim that she is the direct beneficiary of the non-renewed contract to administer the TJCP, this court likewise considers the contracts.

-19-

ought not to pass on questions of constitutionality . . . unless such [questions are] unavoidable."). This is especially so when the record reveals strong reason to believe the question this court is asked to answer is entirely hypothetical and divorced from the true state of facts before the court. *See United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 90 n.22 (1947). ("It has long been this Court's considered practice not to decide abstract, hypothetical or contingent questions, or to decide any constitutional question in advance of the necessity for its decision, or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, or to decide any constitutional question except with reference to the particular facts to which it is to be applied." (alterations and quotations omitted)).

Having decided that it is appropriate to resolve this appeal on the basis of whether Calderón's claim plausibly alleges a direct impact flowing from Denver's allegedly unconstitutional actions in depriving her of the contract to administer the TJCP, we turn to that question. Calderón's complaint plausibly alleges her injuries are not derivative of claims belonging to CNDC. The complaint alleges that CRP entered into a contract with Denver through CRP's fiscal and/or financial agent, CNDC. The contracts between Denver and CNDC do not indicate CNDC is anything other than what is described in Calderón's complaint: a fiscal agent that distributes money from Denver to CRP and, in exchange for a fee,

provides human-resource services to CRP. As to CRP, it is plausible to read Calderón's complaint as alleging that CRP is nothing more than a Denver project, not an independent entity or business, and that she, as CRP's executive director, is charged with implementing and providing the services of the TJCP. In that regard, as noted above, Calderón's complaint refers to herself and CRP interchangeably as the party that contracted with the City to administer the TJCP. Indeed, Calderón's complaint specifically alleges that as a result of her speaking out as a woman and Latinx advocate, Denver officials set about to deprive her of her contract.

Because Calderón's complaint alleges a direct relationship between her damages flowing from the loss of the contract to administer the TJCP, the district court erred in dismissing the complaint on the basis of a lack of prudential standing. We note, however, that the district court can hardly be blamed for resolving the case as it did given how the parties litigated the case below. Nevertheless, for those reasons set out above, it is both unnecessary and unwise to resolve this appeal on the hypothetical and factually irrelevant question whether an employee of a corporation or business can bring a claim against a government actor for otherwise indirect violations of the employee's constitutional rights. Of course, should that question become relevant on a more complete record produced at the summary judgment stage, something that seems unlikely given all the

additional information about CRP and CNDC disclosed on appeal, the district court will be well prepared to provide an answer.

## IV.  CONCLUSION

For those reasons set out above, the order of the United States District Court for the District of Colorado dismissing Calderón's complaint for lack of prudential standing is hereby **REVERSED**.  The matter is **REMANDED** to the district court for further proceedings consistent with this opinion.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge